UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BMADDOX ENTERPRISES LLC, d/b/a SILENCER CENTRAL, <br><br> Plaintiff, <br><br> ·vs. <br><br> FEDERAL EXPRESS CORPORATION, d/b/a/ FedEx, <br><br> Defendant. | 4:25-CV-04196-RAL <br><br><br> OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |

Plaintiff BMaddox Enterprises LLC, doing business as Silencer Central (Silencer Central), sued Defendant Federal Express Corporation (FedEx). Doc. 1. Silencer Central's Amended Complaint seeks damages for negligent misrepresentation, breach of contract, and promissory estoppel. Doc. 6. FedEx filed a Motion to Dismiss, Doc. 14, under Federal Rule of Civil Procedure 12(b)(6) claiming that the Airline Deregulation Act preempts Silencer Central's negligent misrepresentation and promissory estoppel claims and that the Amended Complaint fails to state a claim. This Court grants in part and denies in part FedEx's Motion to Dismiss, Doc. 14, for the reasons explained below.

I.    **Facts**

This Court makes no findings of fact but derives the facts from Silencer Central's Amended Complaint, Doc. 6, accepting all the factual allegations as true, which this Court must do in ruling

1

on a motion to dismiss for failure to state a claim. Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012).

Silencer Central sells firearm sound suppressors (Silencers[1]) and accessories to customers for various firearm applications. Doc. 6 ¶ 9. As part of that business, Silencer Central "assists customers with Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) paperwork and compliance." Id. ¶ 10. "Silencer Central markets its products to customers with a 'Direct to Door Shipping' option," and Silencer Central "deliver[s] its products directly to customers in the 42 states where such sales are permitted." Id. ¶ 11. Silencer Central historically contracted with FedEx "to ship and deliver Silencer Central's products, including its Silencers, from its warehouse in Sioux Falls, South Dakota to Silencer Central's 41 other business locations within the United States, which is referred to as its 'bulk business to business' leg of product delivery." Id. ¶ 12. Silencer Central holds and maintains a Federal Firearms License (FFL) for these various business locations. Id. ¶ 47. Before the agreement in dispute here, Silencer Central had to arrange shipping from its various business locations directly to its consumers with a different delivery company. Id. ¶ 13.

In 2024, FedEx approached Silencer Central to expand their existing relationship to include FedEx's shipment of products from Silencer Central's various business locations directly to Silencer Central's customers, "eliminating the need for Silencer Central to arrange for two separate stages of shipping with two different companies for its products." Id. ¶ 14. "FedEx knew that Silencer Central's primary products that were to be shipped and delivered to customers were Silencers" when it approached Silencer Central to expand their business relationship. Id. ¶ 15.

---

[1] Silencers are within the definition of a "firearm" under federal law. See 18 U.S.C. § 921(a)(3)(C).

2

Silencer Central alleges that a key term of the delivery services FedEx understood and agreed to was the delivery of Silencers directly to customers' homes. Id. ¶ 16.

On or about September 6, 2024, several FedEx employees, including Laurel Nelson and Lee Silverstein, visited Silencer Central's Sioux Falls facility to learn more about Silencer Central's shipping process and customer experience. Id. ¶ 17. FedEx employees inquired about why Silencer Central was not using FedEx for shipments directly to customers. Id. ¶ 18. Silencer Central responded that "it did not believe it was permitted to use FedEx to ship directly to customers, to which FedEx responded that Silencer Central could, in fact, ship Silencers directly to its customers through FedEx and consolidate all its transportation needs with FedEx." Id. ¶ 19. "FedEx affirmatively and unequivocably represented to Silencer Central that its transportation and pricing . . . would include FedEx two-day delivery from each of Silencer Central's FFL business locations to customers' homes" in subsequent communications and negotiations. Id. ¶ 20.

In December 2024, Silencer Central notified its former product delivery service provider for customer deliveries that Silencer Central was transitioning to FedEx for this service. Id. ¶ 21. In January 2025, during negotiations, Silencer Central received a draft agreement from FedEx with contract language that was inconsistent with the parties' previous discussion "about how the delivery service relationship would operate and key terms of that expanded relationship." Id. ¶ 22. Due to the discrepancy, Silencer Central raised issues in communications to FedEx, including an email stating:

> On the last page where the language states "FedEx reserves the right to amend, modify or discontinue the Program or Customer's participation in the Program at any time. Notwithstanding, FedEx and Customer agree that either party may terminate this Program at any time upon thirty (30) days written notice to the other." You won't use this language to make a Silencer unfriendly amendment or discontinue the program or use the 30 day no cause termination right during the first year as our efforts associated with the movement to this program are massive and we need to capture the rebates to make this competitive.

3

Id. ¶ 23. In response, on January 17, 2025, FedEx employee Joel Wilcox confirmed that "FedEx would not discontinue the program or terminate the contract during the first year because FedEx wanted a long-term partnership." Id. ¶ 24. Silencer Central also alleges that FedEx represented in the same email response that "Silencer Central would not incur surcharges on various shipments." Id. ¶ 25. Yet, FedEx then imposed improper surcharges on Silencer Central's invoices. Id.

On or about February 5, 2025, based on extensive negotiations and in reliance on the representations by FedEx, Silencer Central and FedEx executed the "FedEx Transportation Services Agreement" (TSA). Id. ¶ 27. Under the TSA, "FedEx agreed to provide certain transportation services (Services) to Silencer Central, for the applicable Service identified on the pricing attachments that are attached hereto and incorporated herein." Id. ¶ 28 (internal marks omitted). The TSA contained three attachments regarding various pricing terms for different delivery options provided by FedEx Express, FedEx Ground, and FedEx Freight to Silencer Central. Id. ¶¶ 30–32. Another attachment to the TSA entitled the "Earned Discount Program Details" provides "terms regarding discounts that Silencer Central will earn according to the pricing attachments." Id. ¶ 33. The TSA's final attachment, the "Contract Additional Incentive," "provides that Silencer Central will be paid an additional incentive if it achieves $8,000,000 in annualized gross transportation charges in the first year of the [TSA]." Id. ¶ 34. Silencer Central alleges in addition to the previous representations made during negotiations, "the anticipated discounts, rebates, and/or contract incentives[2] promised in the [TSA] were key, material terms that Silencer Central relied upon" in switching to FedEx. Id. ¶ 35.

---

[2] Silencer Central provides two examples of the incentives offered in the TSA: 1) "if Silencer Central met or exceeded $4 million worth of shipments in a six-month period, Silencer Central was to have received a $1.40 rebate for every package that it had shipped during that six-month period"; and 2) "FedEx offered approximately $40,000.00 in technology incentives to Silencer

4

On February 24, 2025, FedEx began providing delivery services under the TSA to Silencer Central, including shipping Silencers directly to customers. Id. ¶ 38. FedEx Ground was primarily used for its product delivery services for bulk shipments to its various businesses and shipments directly to customers. Id. ¶ 39.

In May 2025, FedEx told Silencer Central that it would no longer ship Silencers directly to customers. Id. ¶ 40. Silencer Central alleges: "According to FedEx, despite its promises to Silencer Central, FedEx had not authorized an exception for customer delivery of Silencer Central's products. FedEx told Silencer Central that it would have to request an exception from FedEx for shipments directly to customers." Id. "FedEx offered a temporary extension for its transportation services and permitted Silencer Central to continue" shipping directly to customers until the final decision on Silencer Central's exception request was made. Id. ¶ 41.

"On or about June 2, 2025, despite its recruitment of Silencer Central, its promises about being able to ship Silencers directly to customers, and the months of contract negotiations, FedEx told Silencer Central" that its exception request to deliver Silencers directly to customers was denied. Id. ¶ 42. FedEx also provided notice that Silencer Central "had 30 days from June 2, 2025, to wind down that portion of the business." Id. Silencer Central sought an additional thirty-day extension until August 2, 2025, for FedEx to continue shipping Silencers directly to customers to allow for Silencer Central to transition to an alternative transportation service. Id. ¶ 43. FedEx denied Silencer Central's request citing to "a previous, separate agreement, entitled 'FedEx Firearms Shipping Compliance Agreement' ('2021 Firearms Agreement') as one reason for its decision." Id. ¶ 44.

---

Central, which Silencer Central anticipated receiving over the first two years of the [TSA]." Doc. 6 ¶¶ 36–37.

5

Silencer Central had executed the 2021 Firearms Agreement with FedEx on September 9, 2021, to conduct its "bulk business to business" shipments. Id. ¶ 45. Under the 2021 Firearms Agreement, Silencer Central "shall only ship to recipients that have an active FFL." Id. ¶ 46. No FedEx employee mentioned or referenced the 2021 Firearms Agreement throughout the negotiation process for the TSA in late 2024 and early 2025, or indicated that the 2021 Firearms Agreement would prevent shipments of Silencers directly to customers' homes. Id. ¶ 48. "FedEx's repeated, unequivocal statements that it could and would ship Silencers directly to Silencer Central's customers persuaded Silencer Central that the 2021 Firearms Agreement did not apply any longer to the 'business to customer' leg of delivery or that the restriction within the 2021 Firearms Agreement had changed." Id. ¶ 49. "The [TSA] does not reference or incorporate the 2021 Firearms Agreement." Id. ¶ 50.

Silencer Central asserts that it was likely to meet or exceed the volume metrics under the pricing addendums, thereby granting them "significant credits, rebates, and incentives" as part of the TSA based on its historical business activity and shipments made before FedEx terminated the TSA. Id. ¶ 51. Due to FedEx's abrupt termination of the TSA, Silencer Central has incurred significant costs in transitioning its nationwide shipping services to a different delivery company at higher rates than Silencer Central had before entering into the TSA. Id. ¶ 52.

For its first cause of action, negligent misrepresentation, Silencer Central asserts that FedEx was negligent in misrepresenting that 1) "it could and would deliver Silencer Central's products directly to Silencer Central's customers"; 2) "it would not terminate the [TSA] in the first year"; and 3) "that it would not impose surcharges on some of Silencer Central's deliveries." Id. ¶¶ 54–55. Silencer Central alleges that FedEx made these statements without reasonable grounds for believing them to be true and with the intent to induce Silencer Central into entering into the

6

TSA. Id. ¶¶ 56–57. Silencer Central asserts that it reasonably and justifiably relied on FedEx's representations, and FedEx has admitted that the representations were not true as it provided notice that certain terms of the TSA were terminated within the first year. Id. ¶¶ 58–61.

Silencer Central's second claim for breach of contract asserts the TSA is a valid, enforceable contract but not a completely integrated agreement. Id. ¶ 64. Silencer Central alleges FedEx agreed to additional terms outside of the TSA "in writing, specifically agreeing that it would not terminate the [TSA] in the first year and would not impose surcharges on some of Silencer Central's delivery services." Id. ¶ 65. Silencer Central asserts FedEx expressly and impliedly agreed that it would ship Silencers directly to customers, and, in fact, did so from February 24, 2025, to June 2, 2025, under the terms of the TSA. Id. ¶¶ 66–67. The TSA "states that it supersedes all pricing agreement and addenda, if any, between FedEx and [Silencer Central] for the Services, package types, and [Silencer Central] account numbers covered by this Agreement and identified on the respective pricing attachments." Id. ¶ 68 (cleaned up and citation omitted). Silencer Central contends the prior representations are terms of the TSA, because it "does not contain a merger clause or a complete integration clause that supersedes or excludes prior representations." Id. ¶ 69. Silencer Central alleges it fully performed under the TSA while FedEx's decision to terminate the TSA by refusing to deliver Silencers to customers and imposing surcharges on Silencer Central constitutes a material breach of the TSA. Id. ¶¶ 70–71.

In Count III, Silencer Central brings a promissory estoppel claim. Id. ¶¶ 74–79. Silencer Central alleges that FedEx "promised or manifested an intent" that it would deliver Silencers to Silencer Central's customers and would not terminate the TSA in the first year nor impose certain surcharges because FedEx wanted a long-term partnership. Id. ¶¶ 75–76. Silencer Central alleges

it reasonably and justifiably relied on FedEx's promises to Silencer Central's detriment "as Silencer Central altered its position and terminated" its prior shipping services. Id. ¶ 77.

## II.    Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss under Rule 12(b)(6), "[c]ourts must accept a plaintiff's factual allegations as true" and construe all inferences in the plaintiff's favor "but need not accept a plaintiff's legal conclusions." Retro Television Network, 696 F.3d at 768–69. Although detailed factual allegations are unnecessary, the plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Still, "conclusory statements" and "naked assertion[s] devoid of further factual enhancement" do not satisfy the plausibility standard. Iqbal, 556 U.S. at 678 (alteration in original) (citation and internal marks omitted).

"Though matters outside the pleadings may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleadings." Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017) (internal marks and citation omitted). "In general, materials embraced by the complaint include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not

8

physically attached to the pleadings.'" Id. (quoting Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012)). "[C]ourts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." Id. (internal marks and citation omitted). "In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss. This is true even if contract documents not attached to the complaint refute a breach-of-contract claim, or a claim that defendant breached a statutory or common law duty." Id. (cleaned up and citations omitted).

## III. Discussion

FedEx moved to dismiss Silencer Central's claims on two grounds: preemption under the Airline Deregulation Act of 1978 (ADA) and failure to state a claim. Doc. 15. FedEx contends that Silencer Central's negligent misrepresentation and promissory estoppel claims are preempted by the ADA and must be dismissed. Id. at 8–12. FedEx concedes that Silencer Central's breach-of-contract claim is not preempted by the ADA. FedEx moved to dismiss all claims for failure to state a claim. Id. at 12–24. This Court first addresses ADA preemption as to Silencer Central's negligent misrepresentation and promissory estoppel claims, and then addresses FedEx's failure to state a claim arguments.

### A. ADA Preemption

Counts I and III of the Amended Complaint are claims for negligent misrepresentation and promissory estoppel related to the TSA between Silencer Central and FedEx. Doc. 6 at 10, 13. FedEx contends that these two claims are preempted by the ADA. Doc. 15 at 8–12. FedEx asserts that it is an air carrier as defined by the ADA and that the negligent misrepresentation and

9

promissory estoppel claims relate to the service it provides to Silencer Central. Id. at 11–12. FedEx argues that the negligent misrepresentation and promissory estoppel claims are state-imposed obligations and thus preempted by the ADA. Id. at 10–11.

Silencer Central counters that FedEx improperly assumes it qualifies as an "air carrier" under the ADA. Doc. 17 at 14. Silencer Central also asserts that the claims do not relate to a service FedEx provided. Id. at 14–15. Silencer Central contends even if this Court determines that FedEx is an "air carrier" and the claims relate to a service, the claims are not preempted because they are too tenuous, remote, or peripheral to the service. Id. at 15–16.

Under the ADA, "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b). In enacting the ADA, Congress "sought to promote 'efficiency, innovation, and low prices,' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" Nw., Inc. v. Ginsberg, 572 U.S. 273, 280 (2014) (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)). Thus, the ADA "included a pre-emption provision in order to 'ensure that the States would not undo federal deregulation with regulation of their own.'" Id. (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992)).

In Morales, the Supreme Court of the United States "held that the ADA pre-empted the use of state consumer protection laws to regulate airline advertising . . . recogniz[ing] that the key phrase 'related to' expresses a 'broad pre-emptive purpose.'" Id. (quoting Morales, 504 U.S. at 383). In American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), the Supreme Court held the broad interpretation of the ADA preemption provision barred a claim based on the Illinois Consumer Fraud and Deceptive Business Practice Act but not a breach-of-contract claim. Id. at

10

281. The Court in Wolens stated: "We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." 513 U.S. at 228. The Wolens Court continued, "terms and conditions airlines offer and passengers accept are privately ordered obligations and thus do not amount to a State's enactment or enforcement of any law, rule, regulation, standard, or other provision having the force and effect of law." Id. at 228–29 (cleaned up and citation omitted).

In Ginsberg, the Supreme Court of the United States addressed whether a customer of an airline frequent flyer program could bring a claim against the airline for breach of the implied covenant of good faith and fair dealing. 572 U.S. at 276. The Court first held "that the phrase 'other provision having the force and effect of law' includes common-law claims" and was not limited to state legislation. Id. at 281, 284. The Ginsberg Court next considered whether the "breach of implied covenant claim 'relates to' 'rates, routes, or services.'" Id. at 284. The Court reasoned that the claim sought reinstatement of the airline's frequent flyer program making it related to "rates," and the claim sought "access to flights and to higher service categories," which made it related to "services." Id. The Court finally considered whether the "implied covenant claim [was] based on a state-imposed obligation or simply one that the parties voluntarily undertook." Id. at 285. The Court deemed the implied covenant a state-imposed obligation because under Minnesota law it applies to "every contract" and "parties cannot contract out of the covenant." Id. at 287 (citation omitted). Thus, the Ginsberg Court held that the Minnesota implied covenant of good faith and fair dealing claim brought by the airline passenger was preempted by the ADA. Id. at 289–90. The Ginsberg Court nevertheless used language suggestive that a contract-based claim "the parties voluntarily undertook" would not be preempted by the ADA. Id.

11

at 285; see id. at 276 ("We hold that such a claim is pre-empted if it seeks to enlarge the contractual obligations that the parties voluntarily adopt."), 287 ("When the law of a State does not authorize parties to free themselves from the covenant, a breach of covenant claim is pre-empted under the reasoning of Wolens.").

Since Ginsberg, the United States Court of Appeals for the Eighth Circuit has had two occasions to consider the ADA's preemptive force. In Watson v. Air Methods Corporation, the Eighth Circuit, on rehearing en banc, held "the ADA does not expressly pre-empt [the plaintiff's] wrongful-discharge 'whistleblower' claim involving *post hoc* safety reports to the air carrier," which overruled Botz v. Omni Air International, 286 F.3d 488 (8th Cir. 2002), in relevant part. 870 F.3d 812, 820 (8th Cir. 2017) (en banc). As Watson noted, "some state actions may affect prices, routes, or services 'in too tenuous, remote, or peripheral a manner to have a pre-emptive effect." Id. at 817 (quoting Morales, 504 U.S. at 390). The Watson decision reasoned that the wrongful-discharge claim was "too tenuous, remote, or peripheral" because a court would only order reinstatement of an employee, not alter safety practices of the airline; the complaint may start an investigation but would not ground flights; and the wrongful-discharge claim was akin to other employment laws not preempted by the ADA. Id. at 818–19. In overruling Botz, the Eighth Circuit joined the Third, Ninth, and Eleventh Circuits in holding the ADA did not preempt whistleblower claims. Id. at 816, 819–20.

After Watson, the Eighth Circuit considered a putative class action brought by a patient against an air-ambulance provider for 1) a declaration that any contract between the air carrier and class members was unenforceable, 2) deceptive trade practices, and 3) unclean hands. Ferrell v. Air EVAC EMS, Inc., 900 F.3d 602, 603–04 (8th Cir. 2018). The Ferrell Court held that all three claims were preempted by the ADA. Id. at 606–08. In analyzing the unclean hands claim, the

Eighth Circuit noted "that state common law doctrines such as good faith that relate to air carrier prices, routes, or services are preempted when they are employed 'to ensure that a party does not violate community standards of decency, fairness, or reasonableness.'" Id. at 607 (quoting Ginsberg, 572 U.S. at 286). In considering the claim for declaratory relief that all contracts with the air carrier were unenforceable for lack of a price term, the Ferrell decision reasoned that the price term required under Arkansas law "would apply uniquely and across-the-board to the providers of air-ambulance services operating as federally regulated air carriers. The rule would impose a common-law standard of conduct from which [the air carrier] may not free itself." Id. at 608 (citing Ginsberg, 572 U.S. at 286–88).

The Eighth Circuit's decision in Data Manufacturing, Inc. v, United Parcel Service., Inc. is also informative here because the Federal Aviation Administration Act (FAAAA) has "a substantially similar [preemption] provision" as the ADA. 557 F.3d 849, 852 (8th Cir. 2009). There, a customer brought an action alleging breach of contract, fraudulent and negligent misrepresentation, and money had and received over a dispute on additional charges added to the plaintiff's shipping services. Id. at 851. The shipping company moved to dismiss arguing that the FAAAA preempted the customer's claims. Id. The Eighth Circuit relied on Morales and Wolens in analyzing the preemptive force of the FAAAA. Id. at 852–854. The Eighth Circuit first determined that the charges were related to the carrier's prices and services. Id. at 852. The Eighth Circuit then determined that the plaintiff's claims (including negligent misrepresentation), except for the breach of contract claim, were preempted by the FAAAA. Id. at 853–54. In coming to this decision, the Eighth Circuit in Data Manufacturing reasoned that the four claims "arise outside of the four corners of the contract between [the parties], and are claims that are enlarged or enhanced,

13

and indeed, are dependent upon, [] state laws and policies," which caused them to be preempted under the Wolens decision. Id. at 853.

In deciding whether Silencer Central's common-law claims for negligent misrepresentation and promissory estoppel are preempted by the ADA, this Court must determine whether the state-law claims have a connection with or reference to a price, route, or service of an air carrier; if they do, this Court then must determine whether Silencer Central's claims are based on a state-imposed obligation or stem from self-imposed undertakings. See Wolens, 513 U.S. at 228–29; Ginsberg, 572 U.S. at 281–89. The first question is whether FedEx is an "air carrier," making the ADA applicable to FedEx. An "'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." 49 U.S.C. § 40102(a)(2). Air transportation is defined as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." Id. § 40102(a)(5). Silencer Central's Amended Complaint makes clear that the TSA contained three different pricing attachments for "Express," "Ground," and "Freight." See Doc. 6 ¶¶ 30–32. The inclusion of "Express" pricing indicates that air transportation was contemplated by the TSA. Additionally, the Amended Complaint does not indicate that only FedEx Ground was used to deliver products under the TSA. See id. ¶ 39 ("Upon information and belief, Silencer Central *primarily* used FedEx Ground for its product delivery services for bulk shipments on the 'bulk business to business' leg and for shipments directly to customers[.]" (emphasis added)). The broad definition of "air carrier" to encompass "undertaking by *any means, directly or indirectly*, to provide air transportation," 49 U.S.C. § 40102(a)(2) (emphasis added), establishes that FedEx is an air carrier for the services provided under the TSA. Even if FedEx is not an "air carrier" under the ADA, the analysis changes little because FedEx then must be a "motor or air carrier" under the FAAAA. See 49 U.S.C.

14

§§ 14501(c)(1), 41713(b)(4)(A). The FAAAA preemption clause has nearly identical preemption language to the ADA. Compare 49 U.S.C. § 14501(c)(1), with id. § 41713(b). Courts accordingly use cases interpreting the ADA preemption provision in applying the FAAAA's preemption provision. See, e.g., Solo v. United Parcel Serv. Co., 819 F.3d 788, 797 (6th Cir. 2016); Data Mfg., 557 F.3d at 852–54.

The next question is whether Silencer Central's negligent misrepresentation and promissory estoppel claims "relate to" FedEx's services. Wolens, 513 U.S. at 226. The Eighth Circuit in Watson noted the split across circuits in the definition of "related to" under the ADA. 870 F.3d at 817–18.

> Some courts say that it refers only to such things as the frequency and scheduling of air transportation, and to the selection of markets to or from which transportation is provided, while others construe the term more broadly to mean the elements of the contractual arrangement between the airline and the user of the service, including—in the context of commercial airlines—items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

Id. (collecting cases) (cleaned up and citations omitted). The Eighth Circuit went on to assume, albeit without holding, "that the broader meaning is correct," consistent with the Supreme Court's decision in Wolens. Id. (citing 513 U.S. at 226). The allegations for the negligent misrepresentation and promissory estoppel claims here—1) misrepresenting the ability to provide a particular form of service, 2) promising not to impose surcharges on that service, and 3) promising not to terminate a service agreement within the first year—each target the economic and operational features of FedEx's offered services. See Doc. 6 ¶¶ 54–56. Indeed, at the very heart of the claims is FedEx's failure to continue its shipping services and additional costs Silencer Central incurred for such services. As such, the claims here "relate to" FedEx's services within the meaning of the ADA's preemption clause. See Data Mfg., 557 F.3d at 852 (finding additional charges imposed on shipments related to prices and services of the carrier).

15

The more complicated question is whether, taking the well-pleaded allegations of the Amended Complaint as true, the negligent misrepresentation and promissory estoppel claims are "state-imposed obligations," subject to preemption, rather than a "contractual commitment voluntarily undertaken," not subject to preemption. See Wolens, 513 U.S. at 228–29. Under South Dakota law, negligent misrepresentation occurs when a party "makes (1) a misrepresentation, (2) without reasonable grounds for believing the statement to be true, (3) with the intent to induce a particular action by another party, and the other party (4) changes position with actual and justifiable reliance on the statement, and (5) suffers damage as a result." Fisher v. Kahler, 641 N.W.2d 122, 126–27 (S.D. 2002). The negligent misrepresentation claim "arise[s] outside of the four corners of the contract between [FedEx] and [Silencer Central], and [is] [a] claim[] that is enlarged or enhanced, and indeed, [is] dependent upon, [South Dakota] state laws and policies." See Data Mfg., 557 F.3d at 853–54 (finding claims, including negligent misrepresentation, were preempted by the FAAAA based on the Supreme Court's reasoning in Morales and Wolens because the "ADA's preemption clause . . . reads very much like the FAAAA's preemption clause"); see also Fisher, 641 N.W.2d at 126 ("Negligence is the breach of a legal duty imposed by statute or common law." (quoting Stevens v. Wood Sawmill, Inc., 426 N.W.2d 13, 14 (S.D. 1988))). The negligent misrepresentation claim can be understood as imposing a state "'public polic[y] or theor[y] of competition or regulation on the operations' of a carrier." Data Mfg., 557 F.3d at 853 (quoting Wolens, at 229 n.5); see also Ferrell, 900 F.3d at 607 (quoting Ginsberg, 572 U.S. at 286); Fisher 641 N.W.2d at 125 ("A duty arises either by legislation or by the common law, through the ever-changing movement of social, political, and economic forces."). After all, negligent misrepresentation is a tort claim and not a contract or quasi-contract claim, thus relying on a state common law doctrine "employed to ensure that a party does not violate community

16

standards of decency, fairness, and reasonableness" by benefitting from its misrepresentation. Ferrell, 900 F.3d at 607 (citation and internal marks omitted). Therefore, Silencer Central's claim for negligent misrepresentation is preempted by the ADA.

The most difficult question is whether the promissory estoppel claim, as pleaded in the Amended Complaint, is a "state-imposed obligation" or a "contractual commitment voluntarily undertaken." See Wolens, 513 U.S. at 228–29. Promissory estoppel under South Dakota law "may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise would be performed" and requires "1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable to the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made." Garrett v. BankWest, Inc., 459 N.W.2d 833, 848 (S.D. 1990) (citations omitted). Promissory estoppel also requires the existence of a "reasonable belief that a promise [will] be performed." JED Spectrum Inc. v. Stoakes, 24 N.W.3d 108, 123 (S.D. 2025) (quoting Garrett, 459 N.W.2d at 848). The Supreme Court of South Dakota indeed has implied that a promissory estoppel claim requires a promise akin to a "meeting of the minds" and a promise that is more than "vague and uncertain." Vander Heide v. Boke Ranch, Inc., 736 N.W.2d 824, 834 (S.D. 2007). Silencer Central alleges that FedEx promised to deliver Silencers to customers and not terminate the TSA during the first year or impose certain surcharges. Doc. 6 ¶¶ 75–76. There are some parallels between these South Dakota elements of promissory estoppel, the claims in the Amended Complaint, and the Wolens language exempting from ADA preemption claims for a "contractual commitment voluntarily undertaken." 513 U.S. at 228–29.

Other courts have allowed similar claims to proceed under the ADA or FAAAA. The Seventh Circuit held that the ADA does not preempt a promissory estoppel claim in ATA Airlines,

17

Inc. v. Federal Express Corporation. See 665 F.3d 882, 884 (7th Cir. 2011) ("Promissory estoppel, as the word 'promissory' implies, furnishes a ground for enforcing a promise made by a private party, rather than for implementing a state's regulatory policies."); see also S.C. Johnson & Son, Inc. v. Transport Corporation of America, Inc., 697 F.3d 544, 556 (7th Cir. 2012) (citing ATA Airlines in analyzing the preemptive scope of the FAAAA). The Sixth Circuit similarly allowed an unjust enrichment claim to survive a motion to dismiss under the preemption clause of the FAAAA. Solo, 819 F.3d at 798 ("The doctrine of unjust enrichment does not synonymously apply to all contracts as a matter of state policy. Instead, unjust enrichment serves to 'effectuate the intentions of parties or to protect their reasonable expectations,' and thus looks to the particular parties to a transaction rather than a universal, state-imposed obligation." (quoting Ginsberg, 572 U.S. at 286)). Under Wolens, the promissory estoppel allegations of the Amended Complaint sound more akin to "contractual obligations voluntarily undertaken" than a "state-imposed obligation." See 513 U.S. at 228–29. Even under the somewhat different standard of Ginsberg which extends preemption to claims "seek[ing] to enlarge the contractual allegations that the parties voluntarily adopt," 572 U.S. at 276, the allegations of promissory estoppel in the Amended Complaint survive a motion to dismiss.

### B.      Failure to State a Claim

#### 1.      Breach of Contract

Count II of the Amended Complaint asserts a breach-of-contract claim alleging that FedEx breached the TSA when it terminated the contract by refusing to ship Silencers to customers and imposing surcharges on various shipments. Doc. 6 ¶¶ 63–73. FedEx moved to dismiss the breach-of-contract claim for failure to state a claim. Doc. 15 at 22–24. FedEx contends it did not breach

the TSA because it followed the express terms of the TSA and 2021 Firearms Agreement in refusing to ship Silencers directly to customers. Id. at 22.

Under South Dakota law, "[t]he elements of a breach of contract are (1) an enforceable promise; (2) a breach of that promise; and (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010) (citing Guthmiller v. Deloitte & Touche, L.L.P., 699 N.W.2d 493, 498 (S.D. 2005)). Silencer Central has stated a viable breach-of-contract claim. Silencer Central alleges that it entered into the TSA, an enforceable contract; that FedEx breached that contract by refusing to ship Silencers directly to customers, imposing surcharges on various shipments, and terminating the agreement in the first year; and that Silencer Central has incurred damages because of FedEx's breach. See Doc. 6 ¶¶ 64–73. These allegations, taken as true, establish an enforceable promise, a breach of that promise, and resulting damages, the necessary elements of the claim. See Bowes Constr., Inc., 793 N.W.2d at 43. Thus, Silencer Central has alleged sufficient "factual content that allows the court to draw the reasonable inference that [FedEx] is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

FedEx contends that the alleged conduct could not have breached the TSA because the 2021 Firearms Agreement prohibits FedEx from shipping Silencers to non-FFL holders. Doc. 15 at 22. However, this Court must take as true all factual allegations pleaded in the complaint. See Retro Television Network, 696 F.3d at 768–69. The Amended Complaint specifically alleges that the "[TSA] does not reference or incorporate the 2021 Firearms Agreement," Doc. 6 ¶ 50, and that the 2021 Firearms Agreement was executed "to conduct its 'bulk business to business' shipments," id. ¶ 45. Indeed, in this Court's review of the TSA,[3] it could not locate any reference to the prior

---

[3] FedEx submitted a copy of the TSA, the 2021 Firearms Agreement, and a snippet of the Service Guide when filing its Motion to Dismiss. See Docs. 16-1, 16-2, 16-3. This Court may consider "materials embraced by the complaint includ[ing,] 'documents whose contents are alleged in a

19

2021 Firearms Agreement. See Doc. 16-1. The TSA, however, does reference the Service Guide, but the Service Guide does not expressly incorporate the 2021 Firearms Agreement, though it requires a customer to "enter into an approved FedEx Firearms Shipping Compliance Agreement before shipping any firearms with FedEx." Doc. 16-3 at 4. The Service Guide also provides: "Only customers holding a [FFL] . . . may ship firearms with FedEx." Id. Silencer Central has an FFL, so under the Service Guide, it appears that Silencer Central has a colorable claim that it is permitted to ship Silencers with FedEx. This Court cannot determine on a motion to dismiss whether the 2021 Firearms Agreement is applicable to the TSA, and instead, must accept Silencer Central's factual allegations as true and construe all inferences in Silencer Central's favor. Retro Television Network, 696 F.3d at 768–69. Thus, taking all the allegations of the Amended Complaint as true, FedEx's argument does not overcome the well-pleaded factual allegations of the Amended Complaint.

### 2.    Promissory Estoppel

Count III of the Amended Complaint asserts a promissory estoppel claim alleging that Silencer Central justifiably relied on FedEx's promise to ship Silencers to Silencer Central's detriment. Doc. 6 ¶¶ 74–79. FedEx contends that the promissory estoppel claim fails because 1) there is a valid and enforceable contract between the parties, and 2) Silencer Central cannot plead it acted reasonably in justifiable reliance on the alleged promise. Doc. 15 at 20–22. As discussed above, "[p]romissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise [will] be performed." JED Spectrum Inc., 24 N.W.3d at

---

complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." Zean, 858 F.3d at 526 (quoting Ashanti, 666 F.3d at 1151). Silencer Central's allegations in its Amended Complaint refer to content from the TSA and the 2021 Firearms Agreement. See Doc. 6.

123 (alteration in original) (quoting <u>Garrett</u>, 459 N.W.2d at 848). Additionally, "1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made." <u>Id.</u> (quoting <u>Hahne v. Burr</u>, 705 N.W.2d 867, 873 (S.D. 2005)).

Silencer Central has stated a promissory estoppel claim. Silencer Central alleges that FedEx promised to ship its Silencers directly to its customers and that FedEx would not impose surcharges on such shipments. Doc. 6 ¶¶ 75–76. Silencer Central alleges that it "incurred significant costs and expenses in transitioning its home delivery services to FedEx in reliance on FedEx's representations." <u>Id.</u> ¶ 26. Silencer Central told FedEx that its "efforts associated with the movement to [FedEx] are massive." <u>Id.</u> ¶ 23. Thus, Silencer Central has alleged a substantial detriment in an economic sense and that this loss was foreseeable to FedEx. Further, Silencer Central alleges that FedEx began shipping Silencers directly to customers under the TSA in February 2025 and did so until June or July 2025. <u>Id.</u> ¶¶ 38–42. In doing so, Silencer Central terminated its prior shipping services, thereby altering its position. <u>Id.</u> ¶ 77. Thus, taking the well-pleaded allegations as true, Silencer Central may have acted reasonably in justifiable reliance on FedEx's promise to ship Silencers.

Under the Federal Rules of Civil Procedure, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). When a party makes alternative statements, a "pleading is sufficient if any one of them is sufficient." <u>Id.</u> "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Although an equitable remedy "is generally unavailable when there exists an adequate remedy at law," "[i]t is not generally a ground

for dismissal of a complaint asserting equitable claims that the plaintiff has an adequate remedy at law." <u>Nw. Pub. Serv. v. Union Carbide Corp.</u>, 115 F. Supp. 2d 1164, 1172 (D.S.D. 2000) (cleaned up and citations omitted) (declining to dismiss claims for unjust enrichment and restitution where plaintiff also pleaded claims for fraud and breach of warranty). At this stage, "it is too early to tell whether [Silencer Central's] claims can be redressed" under its breach of contract theory, and this Court accordingly denies FedEx's motion to dismiss Count III. <u>Id.</u>

## IV.     Conclusion

For the reasons explained above, it is hereby

ORDERED that FedEx's Motion to Dismiss, Doc. 14, is granted in part and denied in part. The Motion to Dismiss is granted as to Count I but denied as to Counts II and III.

DATED this __9th__ day of June, 2026.

BY THE COURT:

_____

ROBERTO A. LANGE
CHIEF JUDGE

22